1

2

3

4                    UNITED STATES DISTRICT COURT

5                         DISTRICT OF NEVADA

6   TYRON R. DENSON,                          3:13-cv-00398-HDM-WGC

7                              Plaintiff,     **REPORT & RECOMMENDATION OF**
                                              **U.S. MAGISTRATE JUDGE**
8        v.

9   CAROLYN W. COLVIN, Acting Commissioner
    of Social Security,
10
                              Defendant.
11

12          This Report and Recommendation is made to the Honorable Howard D. McKibben,

13   Senior United States District Judge. The action was referred to the undersigned Magistrate Judge

14   pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the

15   court is Plaintiff Tryon Denson's Motion for Remand and/or Reversal. (Doc. # 16.)[1] Defendant

16   Commissioner filed an Opposition to Motion for Remand/Reversal and Cross-Motion for

17   Summary Judgment. (Doc. ## 19, 20.) Plaintiff filed a reply brief. (Doc. # 22.) After a thorough

18   review, the court recommends that Plaintiff's motion be denied and the Commissioner's cross-

19   motion be granted and the decision be affirmed.

20                              **I. BACKGROUND**

21          On November 17, 2008, Plaintiff filed an application for Supplemental Security Income

22   (SSI), alleging disability from mental illness and hypertension beginning on October 23, 2008.

23   (Administrative Record (AR) 77, 179, 182.)

24          The Commissioner denied the application initially and on reconsideration. (AR 81-84,

25   95-97.) Plaintiff made a timely request for a hearing before an administrative law judge (ALJ) to

26   challenge the Commissioner's determination. (AR 98.) On June 16, 2011, Plaintiff appeared and

27   _____

28        [1] Refers to court's docket number. Unless otherwise indicated, all page number references are to the court's
    docketed page numbers.

1    testified before the ALJ. (AR 46-76.)

2         The ALJ followed the five-step sequential process for evaluating such claims, set forth in

3    20 C.F.R. § 1520, and issued a written decision on September 2, 2011, finding Plaintiff was not

4    disabled. (AR 33-41.) Plaintiff appealed, and the Appeals Council denied review. (AR 1-5.)

5    Thus, the ALJ's decision became the final decision of the Commissioner.

6         Plaintiff now appeals the decision to the District Court. (Doc. # 16.) Plaintiff argues that

7    the ALJ erred by failing to give specific and legitimate reasons for rejecting the opinions of

8    examining (non-treating) physician, Dr. Gerson. (*Id*. at 9-12.) In addition, Plaintiff contends the

9    ALJ erred by failing to articulate clear and convincing reasons for rejecting Plaintiff's testimony.

10   (*Id*. at 12-17.)

11        Conversely, the Commissioner argues that the ALJ reasonably rejected portions of

12   Dr. Gerson's opinions and instead gave great weight to the opinions of State agency consultative

13   physician (non-treating and non-examining) Dr. Henry. (Doc. # 19 at 3-6.) The Commissioner

14   also argues that the ALJ reasonably found Plaintiff's complaints of disability not fully credible.

15   (*Id*. at 6-12.)

16                              **II. STANDARD OF REVIEW**

17        The court must affirm the ALJ's determination if it is based on proper legal standards and

18   the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

19   *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

20   'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

21   reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

22   24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

23        To determine whether substantial evidence exists, the court must look at the record as a

24   whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

25   740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

26   not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

27   --- F.3d --- , 2014 WL 3397218, at * 11 (9th Cir. July 14, 2014) (quoting *Lingenfelter v. Astrue*,

28   504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility,

1  resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v.*

2  *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either

3  affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the

4  Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21

5  (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set

6  aside if the ALJ did not apply proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec.*

7  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir.

8  2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability

9  determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, --

10  - F.3d --- , 2014 WL 3397218, at * 11 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir.

11  2003)).

12  **III. DISCUSSION**

13  **A. Five-Step Sequential Process**

14       Under the Social Security Act, "disability" is the inability to engage "in any substantial

15  gainful activity by reason of any medically determinable physical or mental impairment which

16  can be expected to result in death or which has lasted or can be expected to last for a continuous

17  period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined

18  to be under a disability only if his physical or mental impairment or impairments are of such

19  severity that he is not only unable to do his previous work but cannot, considering his age,

20  education, and work experience, engage in any other kind of substantial gainful work which

21  exists in the national economy, regardless of whether such work exists in the immediate area in

22  which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if

23  he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

24       The Commissioner has established a five-step sequential process for determining whether

25  a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S.

26  137, 140-41 (1987). If at any step the Social Security Administration (SSA) can make a finding

27  of disability or nondisability, a determination will be made and the SSA will not further review

28  the claim. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4); *see also Barnhart v. Thomas*, 540

1    U.S. 20, 24 (2003). "'The burden of proof is on the claimant at steps one through four, but shifts

2    to the Commissioner at step five.'" *Garrison*, --- F.3d --- , 2014 WL 3397218, at * 13 (quoting

3    *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

4         In the first step, the Commissioner determines whether the claimant is engaged in

5    "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied.

6    20 C.F.R. §  404.1520(a)(4)(i), (b); §  416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant

7    is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

8         The second step requires the Commissioner to determine whether the claimant's

9    impairment or a combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and

10   § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits

11   the claimant's physical or mental ability to do basic work activities. *Id*. Basic work activities are

12   "the abilities and aptitudes necessary to do most jobs[,]" which include:

13        (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
          reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking;
14        (3) Understanding, carrying out, and remembering simple instructions; (4) Use of
          judgment; (5) Responding appropriately to supervision, co-workers and usual
15        work situations; and (6) Dealing with changes in a routine work setting.

16   20 C.F.R. §  404.1521 and §  416.921. If a claimant's impairment is so slight that it causes no

17   more than minimal functional limitations, the Commissioner will find that the claimant is not

18   disabled. 20 C.F.R.§  404.1520(a)(4)(ii), (c) and 416.920(a)(ii). If, however, the Commissioner

19   finds that the claimant's impairment is severe, the Commissioner proceeds to step three. *Id*.

20        In the third step, the Commissioner looks at a number of specific impairments listed in 20

21   C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the

22   impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

23   § 404.1520(a)(4)(iii), (d) and §  416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

24   Impairments are severe enough to preclude any gainful activity, regardless of age, education, or

25   work experience. 20 C.F.R. §  404.1525(a). If the claimant's impairment meets or equals one of

26   the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed

27   disabled. 20 C.F.R. §  404.1520(a)(4)(iii), (d), §  416.920(d). If the claimant's impairment is

28   severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to

1    step four. *Yuckert*, 482 U.S. at 141.

2         At step four, the Commissioner determines whether the claimant can still perform "past

3    relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

4    relevant work is that which a claimant performed in the last fifteen years, which lasted long

5    enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R.

6    § 404.1565(a) and § 416.920(b)(1).

7         In making this determination, the Commissioner assesses the claimant's "residual

8    functional capacity" (RFC) and the physical and mental demands of the work previously

9    performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231

10   (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R.

11   § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence,

12   including the claimant's and others' descriptions of limitation, and medical reports, to determine

13   what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and

14   § 416.945(a)(3).

15        A claimant can return to previous work if he or she can perform the "actual functional

16   demands and job duties of a particular past relevant job" or "[t]he functional demands and job

17   duties of the [past] occupation as generally required by employers throughout the national

18   economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

19   citation omitted).

20        If the claimant can still do past relevant work, then he or she is not disabled for purposes

21   of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally,

22   a claimant who is physically and mentally capable of performing past relevant work is not

23   disabled, whether or not he could actually obtain employment.").

24        If, however, the claimant cannot perform past relevant work, the burden shifts to the

25   Commissioner to establish at step five that the claimant can perform work available in the

26   national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-

27   42, 144. This means "work which exists in significant numbers either in the region where such

28   individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant

1  cannot do the work he or she did in the past, the Commissioner must consider the claimant's

2  RFC, age, education, and past work experience to determine whether the claimant can do other

3  work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the

4  testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094,

5  1100 (9th Cir. 1999).

6      "The grids are matrices of the four factors identified by Congress—physical ability, age,

7  education, and work experience—and set forth rules that identify whether jobs requiring specific

8  combinations of these factors exist in significant numbers in the national economy." *Lockwood v.*

9  *Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and

10  citation omitted). The Grids place jobs into categories by their physical-exertional requirements,

11  and there are three separate tables, one for each category: sedentary work, light work, and

12  medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative

13  notice of the numbers of unskilled jobs that exist throughout the national economy at the various

14  functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's

15  ability to find work, including the claimant's age, education and work experience. *Id*. For each

16  combination of factors, the Grids direct a finding of disabled or not disabled based on the

17  number of jobs in the national economy in that category. *Id*.

18      The Commissioner may not rely solely on the Grids unless they accurately and

19  completely describe the claimant's abilities and limitations. *Jones v. Heckler*, 760 F.2d 993, 998

20  (9th Cir. 1985) (citation omitted). The ALJ must take the testimony of a vocational expert where

21  the claimant suffers from non-exertional limitations that are "sufficiently severe so as to

22  significantly limit the range of work permitted by his exertional limitation." *Hoopai v. Astrue*,

23  499 F.3d 1071, 1076 (9th Cir. 2007) (internal quotation marks and citation omitted).[2] Further,

24  where the Commissioner finds that a nonexertional limitation alone is severe (at step two of the

25  sequential process) (absent any exertional limitation), the Commissioner is not required to seek

26  _____

27      [2] "[S]atisfaction of the step two threshold requirement that a claimant prove her limitations are severe is not
   dispositive of the step-five determination of whether the non-exertional limitations are sufficiently severe such as to
28  invalidate the ALJ's exclusive use of the grids without the assistance of a vocational expert." *Hoopai*, 499 F.3d at
   1076.

1   the assistance of a vocational expert at step five unless the nonexertional limitations are

2   "significant, sufficiently severe, and not accounted for in the grid[s]." *See id*. at 1076.

3   If the ALJ relies on a vocational expert, he can call upon the vocational expert to testify

4   as to: "(1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the

5   availability of such jobs in the national economy.'" *Garrison,* --- F.3d --- , 2014 WL 3397218, at

6   * 13 (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (alteration original)). "The

7   ALJ may pose hypothetical questions to the expert that 'set out all of the claimant's impairments'

8   for the VE's consideration." *Id*. (quoting *Gamer v. Secretary of Health and Human Servs.*, 815

9   F.2d 1275, 1279 (9th Cir. 1987)). "'The ALJ's depiction of the claimant's disability must be

10  accurate, detailed, and supported by the medical record.'" *Id.* (quoting *Tackett*, 180 F.3d at 1101).

11  "The testimony of a [VE] is valuable only to the extent that it is supported by medical evidence'

12  and has 'no evidentiary value if the assumptions in the hypothetical are not supported by the

13  record.'" *Id*. (quoting *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989)).

14  If at step five the Commissioner establishes that the claimant can do other work which

15  exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely,

16  if the Commissioner determines the claimant unable to adjust to any other work, the claimant

17  will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071;

18  *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 689 (9th Cir. 2009).

19  **B. ALJ's Findings in this Case**

20  In the present case, the ALJ applied the five-step sequential evaluation process and

21  found, at step one, that Plaintiff had not engaged in substantial gainful activity from the alleged

22  onset date of November 17, 2008. (AR 35.)

23  At step two, the ALJ found it was established that Plaintiff suffered from the following

24  severe impairments: malignant hypertension with congestive heart failure and renal insufficiency

25  and lower back pain. (AR 35.)

26  At step three, the ALJ found that Plaintiff did not have an impairment or combination of

27  impairments that met or medically equaled the severity of one of the Listed Impairments. (AR

28  36.)

1    At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in

2    20 C.F.R. § 416.967(b), except that he can never climb ladders, ropes and scaffolds and must

3    avoid concentrated exposure to extreme cold and heat, and hazards (dangerous machinery,

4    unprotected heights, etc.). (AR 36-40.)

5    The ALJ then found Plaintiff was unable to perform past relevant work as a laborer in

6    warehouses because it exceeded his RFC. (AR 40.)

7    The ALJ proceeded to step five and considering a person of Plaintiff's age (51 at the

8    time), high school education and ability to communicate in English, work experience and RFC,

9    concluded that there are jobs that exist in significant numbers in the national economy that

10    Plaintiff can perform. (AR 41.) Given these factors, and taking into account his additional

11    limitations, the ALJ determined under the Grids that Plaintiff is not disabled. (AR 41.)

12    **C. Medical Opinions**

13    **1. Standard**

14    A claimant must establish disability as a result of "anatomical, physiological, or

15    psychological abnormalities which are demonstrable by medically acceptable clinical and

16    laboratory diagnostic techniques." 20 C.F.R. § 404.1527(a)(1). Evidence of this may include

17    medical opinions which are "statements from physicians and psychologists or other acceptable

18    medical sources that reflect judgments about the nature and severity of [the claimant's]

19    impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the

20    claimant] can still do despite the impairment(s), and [the claimant's] physical or mental

21    restrictions." 20 C.F.R. § 404.1527(a)(2). Medical opinions are considered with other relevant

22    evidence. 20 C.F.R. § 404.1527(b).

23    All medical opinions are to be evaluated by the ALJ. 20 C.F.R. § 404.1527(c). "'In

24    disability benefits cases...physicians may render medical, clinical opinions, or they may render

25    opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison*, -

26    -- F.3d---, 2014 WL 3397218, at * 13 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.

27    1998)). The court "'distinguish[es] among the opinions of three types of physicians: (1) those

28    who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

(examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Treating physicians' opinions are generally given more weight than examining or non-examining physicians. *Id*. In addition, "the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Id*. (citing *Ryan*, 528 F.3d at 1198). "The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Id*. (internal quotation marks omitted).

Treating provider opinions are generally given "controlling weight" "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). This is so long as the treating opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

"The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." *Magallanes*, 881 F.2d at 751 (citations omitted). "[T]he ALJ need not accept a treating physician's opinion which is 'brief and conclusory in form with little in the way of clinical findings to support [its] conclusion.'" *Id*. (quoting *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986)). "To reject the uncontroverted opinion of a claimant's physician, the ALJ must present clear and convincing reasons for doing so." *Id*. (citations omitted).

"'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Ryan*, 528 F.3d at 1198). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the

facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings.'" *Magallanes,* 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Reddick*, 157 F.3d at 725).

If a treating source's opinion is not given controlling weight, the ALJ "must apply the factors set forth in 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(6) in determining how much weight to give each opinion." *Garrison*, ---F.3d---, 2014 WL 3397218, at n. 11. "These factors are the length of the treatment relationship and the frequency of the examination, § 404.1527(c)(2)(i), nature and extent of the treatment relationship, § 404.1527(c)(ii), 'supportability,' § 404.1527(c)(3), consistency,§ 404.1527(c)(4), specialization, § 404.1527(c)(5), and other factors that tend to support or contradict the opinion, § 404.1527(c)(6)." *Id*. "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight...even if it does not meet the test for controlling weight.'" *Id*. at * 14 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

"Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Id*. (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)). "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id*.

**2. Dr. Henry**

Dr. Henry, a State agency non-examining and consultative physician, completed an RFC assessment for Plaintiff dated June 2, 2009. (AR 403-410.) Dr. Henry opined that Plaintiff had the following exertional limitations: (1) occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; (2) stand and/or walk with normal breaks for a total of about six hours in an eight-hour work day; (3) sit with normal breaks for about six hours in an eight-hour workday; and (4) never climb a ladder, rope or scaffolds. (AR 404-405.) In addition,

1   she opined that he should avoid concentrated exposure to extreme heat and cold, and should

2   avoid concentrated exposure to hazards (machinery, heights, etc.). (AR 407.)

3   **3. Dr. Gerson**

4   Dr. Gerson, an examining but non-treating physician, examined Plaintiff on

5   August 9, 2011. (AR 613.) He stated that Plaintiff presented with a chief complaint of malignant

6   hypertension, which he has had his whole life. (AR 613.) Dr. Gerson noted that Plaintiff has been

7   put on various medications for this condition, but it remains high, runs in the 190/130 range, and

8   has caused congestive heart failure. (AR 613.) Plaintiff reported having various

9   electrocardiograms and echocardiograms, and during one echocardiogram Plaintiff reported

10  being told that the walls of his heart were thickened. (AR 613.) Plaintiff also had renal

11  insufficiency, and had seen a nephrologist who told him to keep his blood pressure under control.

12  (AR 613.) He reported shortness of breath to Dr. Gerson and claimed to get palpitations which

13  can last from minutes to an entire day. (AR 613.) He also stated that he experienced intermittent

14  sweats and occasional swelling of the legs. (AR 613.) He told Dr. Gerson that he experienced

15  intermittent chest pain. (AR 613.) He reported being placed on Lasix, which he said helped

16  some. (AR 614.) Plaintiff stated that he had many tests done but his blood pressure still always

17  runs high. (AR 614.) He also said he experienced blurry vision, headaches and vomiting in

18  connection with his high blood pressure. (AR 614.)

19  Plaintiff also claimed to experience back pain since 2001, and informed Dr. Gerson he

20  had been told he has scoliosis, and that doctors have told him his back pain is due to his kidneys.

21  (AR 614.) He said he experienced this pain when he would bend, sit, stand or walk. (AR 614.)

22  On examination, Plaintiff presented as well developed and well nourished, coherent and

23  cooperative. (AR 615.) His blood pressure was 188/104 on the right and 190/108 on the left. (AR

24  615.) His oxygen saturation was ninety-five percent. (AR 615.) He had a regular heart rate,

25  "negative S3" and "positive S4." (AR 615.) Dr. Gerson noted mild scoliosis. (AR 616.) His gait

26  was intact and posture was normal. (AR 616.) He had mild difficulty getting on and off the

27  examination table, moderate difficulty with tandem walking, mild to moderate difficulty walking

28  on his toes, moderate difficulty with squatting and rising, and no need to use an assistive device.

1   (AR 616.)

2   Dr. Gerson diagnosed Plaintiff with: (1) malignant hypertension; (2) history of renal

3   insufficiency; (3) history of congestive heart failure; (4) history of chronic back pain with

4   scoliosis. (AR 616.)

5   Dr. Gerson noted that Plaintiff did not appear short of breath with ambulation or

6   movements about the examination room. (AR 617.) He did not appear "acutely toxic" or

7   "clinically fatigued" at the examination. (AR 617.)

8   In his medical source statement, Dr. Gerson opined that Plaintiff could: lift and carry up

9   to twenty pounds frequently and thirty pounds occasionally; sit for four hours at a time, stand for

10   one hour at a time and walk for one hour at a time without interruption; sit for eight hours, stand

11   for four hours and walk for four hours in an eight-hour work day; frequently reach, handle,

12   finger, feel, push and pull; frequently operate foot controls; occasionally climb stairs and ramps,

13   ladders or scaffolds, stoop, crouch and crawl as a result of his high blood pressure and decreased

14   range of movement related to his back; frequently balance and kneel; never operate a motor

15   vehicle; occasionally tolerate exposure to unprotected heights, moving mechanical parts, dust,

16   odors, fumes and pulmonary irritants, extreme heat and cold; frequently tolerate exposure to

17   humidity and wetness and vibrations; perform activities such as shopping, ambulate without the

18   use of a wheelchair, walker, two canes or crutches; walk a block at a reasonable pace on rough or

19   uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, prepare

20   simple meals and feed himself, care for his own personal hygiene, sort, handle and use paper

21   files. (AR 620-625.)

22   **4. The ALJ's Findings**

23   The ALJ recognized non-examining physician Dr. Henry's opinion that Plaintiff could

24   perform light work except he can never climb ladders, ropes and scaffolds and must avoid

25   concentrated exposure to extreme heat, cold and hazards. (AR 39.) The ALJ accorded this

26   opinion "great weight," stating that it was supported by the medical records which evidenced

27   severe impairments that are medically managed when Plaintiff complies with recommended

28   treatments and physical examination findings that are within normal limits, and diagnostic

1    imagery and testing documenting abnormalities that are chronic but mild in nature. (AR 39.)

2        Next, the ALJ discussed Dr. Gerson's report and opinions. (AR 39-40.) The ALJ pointed

3    out Dr. Gerson's diagnoses of malignant hypertension, history of congestive heart failure, renal

4    insufficiency and history of low back pain with scoliosis. (AR 39.) The ALJ acknowledged

5    Dr. Gerson's opinion that Plaintiff could do less than a full range of light work, and opinion that

6    Plaintiff can only stand or walk four hours in an eight-hour work day and sit eight hours of an

7    eight-hour work day. (AR 39.) The ALJ pointed out Dr. Gerson's opinion that Plaintiff could

8    occasionally climb ladders, ropes and scaffolds, ramps, stairs, stoop, crouch and crawl (while Dr.

9    Henry had opined Plaintiff could never climb ladders, ropes and scaffolds). (AR 40.) The ALJ

10   recognized that Dr. Gerson found Plaintiff should avoid concentrated exposure to hazards,

11   fumes, odors, dust, gases, poor ventilation, and extreme cold or heat (consistent with Dr. Henry's

12   findings). (AR 40.)

13       The ALJ gave "substantial weight" to Dr. Gerson's opinions, based on Dr. Gerson's

14   examination of Plaintiff. (AR 40.) The ALJ found, however, that Dr. Gerson did not have full

15   access to the entirety of Plaintiff's medical records which the ALJ stated showed that Plaintiff

16   was not as limited as he perceived. (AR 40.) Specifically, the ALJ pointed out that while Plaintiff

17   complained regularly of back pain to Dr. Mito (Plaintiff's treating physician), diagnostic tests and

18   imagery showed no objective findings and x-ray and CT scans showed only mild degenerative

19   disc disease. (AR 40.) As such, the ALJ concluded that Dr. Gerson's opinion that Plaintiff should

20   be limited to standing or walking for four hours of an eight-hour work day with occasional

21   postural movements was unsupported by the record and was given little weight. (AR 40.)

22       For these reasons, along with the findings regarding Plaintiff's credibility, discussed

23   *infra*, the ALJ assessed Plaintiff as having the RFC to perform light work except that he can

24   never climb ladders, ropes and scaffolds and must avoid concentrated exposure to extreme cold

25   and heat and hazards. (AR 36.) Affording little weight to Dr. Gerson's opinion that Plaintiff was

26   limited in his ability to stand and walk to four hours of an eight-hour work day, these limitations

27   were not contained in the ALJ's RFC assessment.

28   ///

- 13 -

**5. Analysis**

Plaintiff argues that the ALJ erred by not providing specific and legitimate reasons supported by substantial evidence in the record for rejecting portions of examining physician Dr. Gerson's opinions and adopting the opinions of non-examining, consultative physician Dr. Henry instead. (Doc. # 16 at 9-12.)

Conversely, the Commissioner argues that the ALJ properly reviewed all of the evidence in the record, made findings and explained the bases for the weight given to Dr. Gerson's opinion. (Doc. # 19 at 3.)

Plaintiff argues, without citing any authority, that "[t]he opportunity to review or not review other records by Dr. Gerson rests on the shoulders of the state agency" and "[t]he ALJ could have ordered that Dr. Gerson get the medical records for review but did not." (*Id.* at 11:14-16.) This is contrary to the position taken by Plaintiff before the Appeals Council, where Plaintiff argued that Dr. Gerson was provided the pertinent records and reviewed them in completing his evaluation of Plaintiff. (AR 247.) Moreover, as set forth below, the ALJ's decision to reject a portion of Dr. Gerson's opinion was nevertheless supported by specific and legitimate reasons in the record.

Next, Plaintiff argues that the ALJ's articulation did not address the assumptions made by Dr. Gerson that Plaintiff's back pain was caused by scoliosis which was documented in his medical records. (*Id.* at 12.)

Plaintiff is correct that Plaintiff reported to Dr. Gerson that he had scoliosis and that his treatment records confirmed he had scoliosis. As Plaintiff points out, it is reasonable to conclude that Dr. Gerson assumed Plaintiff's scoliosis was the cause of his back pain. Nevertheless, the ALJ properly set forth specific and legitimate reasons for discrediting Dr. Gerson's opinion regarding Plaintiff's limitations concerning his ability to stand and walk for four hours out of an eight-hour work day. The ALJ pointed out that while Plaintiff complained of back pain to his treating physician, Dr. Mito, his subjective complaints of pain were not supported by objective findings in the record. While Plaintiff may have scoliosis, there is no indication in Plaintiff's medical records that this was the cause of his back pain. Instead, as the Commissioner points out,

the images taken of Plaintiff's back only revealed mild degenerative changes. Therefore, the ALJ did not err in rejecting this opinion of Dr. Gerson. Instead, the ALJ properly provided specific and legitimate reasons that were supported by substantial evidence in the record (the objective clinical findings concerning Plaintiff's back). *See Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Ryan*, 528 F.3d at 1198). The ALJ did exactly what was required—by setting out a detailed summary of the facts and conflicting clinical evidence, giving an interpretation of the facts and evidence and set forth resulting findings. *See Magallanes,* 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). In other words, the ALJ sufficiently set forth an interpretation of the facts and evidence with an adequate explanation of why these interpretations, rather than Dr. Gerson's, were correct. *See Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Reddick*, 157 F.3d at 725).

In conclusion, the court should not remand the Commissioner's decision on this basis.

**B. Plaintiff's Credibility**

**1. Standard**

"[A] claimant's credibility becomes important at the stage where the ALJ is assessing residual functional capacity, because the claimant's subjective statements may tell of greater limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001) (citing SSR 96-7p (1996)). Thus, a claimant's credibility is often crucial to a finding of disability. The ALJ is responsible for determining credibility. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

In general, when deciding to accept or reject a claimant's subjective symptom testimony, an ALJ must engage in two steps: an analysis under *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986) (the "*Cotton* test"), and an analysis of the credibility of the claimant's testimony regarding the severity of his or her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *see also* 20 C.F.R. § 404.1529 (adopting two-part test).

First, under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective evidence of an underlying impairment 'which could

- 15 -

1    reasonably be expected to produce pain or other symptoms alleged.'" *Bunnell v. Sullivan*, 947

2    F.2d 341, 344 (9th Cir.  1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also  Berry v.*

3    *Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010)*; Lingenfelter v.  Astrue*, 504 F.3d 1028, 1036 (9th

4    Cir. 2007). The test "imposes only two requirements on the claimant: (1) [he or] she must

5    produce objective medical evidence of an impairment or impairments; and (2) [he or] she must

6    show that the impairment or combination of impairments *could reasonably be expected to* (not

7    that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis

8    original); *see also* 20 C.F.R. § 404.1529(a)-(b).

9         "Second, if the claimant meets the first test, and there is no evidence of malingering, the

10   ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

11   specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

12   quotation marks and citation omitted); *see also Valentine v. Comm'r of Soc.  Sec. Admin*., 574

13   F.3d 685, 693 (9th Cir.  2009). "This is not an easy requirement to meet: 'The clear and

14   convincing standard is the most demanding required in Social Security cases.'" *Garrison*, --- F.3d

15   ---, 2014 WL at * 16 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.

16   2002)).

17        An ALJ's credibility findings are entitled to deference if they are supported by substantial

18   evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

19   rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a

20   claimant's [symptom] testimony.'" *Bunnell*, 947 F.2d at 345 (quoting *Elam v. Railroad*

21   *Retirement Bd*., 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather,

22   the ALJ must identify what testimony is not credible and what evidence undermines the

23   claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

24        An ALJ may consider various factors in assessing the credibility of the allegedly

25   disabling subjective symptoms, including: daily activities; the location, duration, frequency, and

26   intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage,

27   effectiveness, and side effects of any medication taken to alleviate symptoms; treatment, other

28   than medication, received for relief of symptoms; any measures a claimant has used to relieve

1    symptoms; and other factors concerning functional limitations and restrictions due to symptoms.

2    20 C.F.R. § 404.1529(c)(3)(i)-(vii).

3         When analyzing credibility, an ALJ may properly consider medical evidence in the

4    analysis; however, the ALJ may not reject subjective pain testimony "on the sole ground that it is

5    not fully corroborated by objective medical evidence[.]" *Rollins v. Massanari*, 261 F.3d 853, 857

6    (9th Cir. 2001); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004)

7    (holding ALJ properly determined credibility where claimant's testimony was contradictory to

8    and unsupported by objective medical evidence).

9         **2. ALJ's Findings**

10        The ALJ stated that while Plaintiff's medically determinable impairments could

11   reasonably be expected to cause Plaintiff's alleged symptoms, his statements concerning the

12   intensity, persistence and limiting effects of the symptoms were not credible to the extent they

13   were inconsistent with the RFC assessment. (AR 37.)

14        The ALJ pointed out that Plaintiff alleged a combination of impairments causing

15   weakness, fatigue and chronic pain, limiting activities of daily living, social functioning, and the

16   capacity to concentrate, remember and accomplish tasks. (AR 37.) Plaintiff asserted lifelong high

17   blood pressure that caused congestive heart failure and renal insufficiency with shortness of

18   breath on exertion, palpitations, intermittent sweats, leg swelling, tiredness, blurry vision,

19   headaches and chest pain. (AR 37.) He also claimed to have had back pain since 2001, when he

20   bends, sits, stands, or walks. (AR 37.)

21        The ALJ stated that Plaintiff's uncontrolled hypertension was not a recent development,

22   but a lifelong condition that Plaintiff had worked with for all of his life. (AR 37.) The ALJ

23   likewise concluded that the evidence established that his congestive heart failure and renal

24   insufficiency were mild in nature, and that Plaintiff's non-compliance with recommended

25   medical treatment contributed to the severity and persistence of his symptoms. (AR 37.) Finally,

26   the ALJ pointed out that Plaintiff had recurrently denied in his medical records many of the

27   symptoms he alleged to have experienced in his application. (AR 37.)

28        The ALJ then recounted Plaintiff's medical treatment, starting with hospitalization from

- 17 -

October 23-31, 2008 for accelerated hypertension. (AR 37.) The ALJ noted Plaintiff's statement that since leaving prison he was either noncompliant with medications or determined them to be ineffective or having undesirable side effects. (AR 37.) While in the hospital, a cardiac ultrasound revealed a mild left ventricular hypertrophy, but otherwise normal echocardiogram, and a renal ultrasound showed mild renal insufficiency secondary to poorly controlled hypertension. (AR 37.) In consultation with Dr. Nylk, a nephrologist, an appropriate medication regime was reached, Plaintiff's blood pressure was reduced and he was discharged. (AR 37.)

Dr. Nylk's evaluation reported Plaintiff stating he had been diagnosed with high blood pressure since age 15 and had been known for not complying with medication regimens. (AR 37.) Renal ultrasounds from July 2008 and October 23, 2008 revealed no significant abnormalities and chest x-rays were normal. (AR 38.) An echocardiogram on October 22, 2008 showed mild left ventricular hypertrophy. (AR 38.) Dr. Nylk recorded that Plaintiff complained of blurry vision and occasional headaches but denied chest pain, shortness of breath, abdominal pain, nausea, vomiting, dysuria or hematuria. (AR 38.) Dr. Nylk noted that despite treatment, his blood pressure remained high and medication adjustments were made. (AR 38.)

The ALJ then noted that Plaintiff treated for hypertension, chronic renal insufficiency, back pain, shortness of breath, difficulty with night breathing, dizziness and headaches with Dr. Mito between 2009 and 2011. (AR 38.) His physical examinations were generally within normal limits. (AR 38.) The ALJ then discussed diagnostic and imagery results. A renal ultrasound showed normal kidneys; a head CT showed low attenuation mass in the medial left parotid gland, and subtle low attention density in the left frontal periventricular white matter which may represent postischemic change; an electrocardiogram demonstrated mild to regular regurgitation, left ventricular hypertrophy with estimated ejection fraction of 30-35 % globally, and other findings consistent with grade II diastolic dysfunction and mild pulmonary hypertension; x-rays of the lumbar spine showed L5-S1 disc space narrowing with prominent surrounding spurs, but no stenosis, cord compression or foraminal narrowing and the alignment of his spine was noted as being normal. (AR 38.) An electrocardiogram on March 30, 2010 showed normal sinus rhythm, left atrial enlargement, an historic, age undetermined, inferior

1   myocardial infarction (heart attack) and prolonged QT. (AR 38.)

2     Plaintiff received care on June 15, 2010, that was a follow up to a recent episode of care

3   at St. Mary's Regional Medical Center where he was prescribed Lasix for his heart condition but

4   advised Dr. Mito he had not yet filled the prescription. (AR 38.) St. Mary's records showed that

5   Plaintiff was seen on June 12, 2010 for shortness of breath, but his physical examination was

6   normal overall and treatment with a bronchodilator improved his condition. (AR 38.) Plaintiff

7   was diagnosed with hyspnea with mild pleural effusion seen on the chest CT and discharged.

8   (AR 38.) An electrocardiogram that date showed normal sinus rhythm, left atrial enlargement,

9   left ventricular hypertrophy, and that a heart attack at an undetermined age could not be ruled

10   out. (AR 38.) Chest x-rays revealed no evidence of pulmonary embolism, small pleural

11   effusions, mild patchy pneumonitis, some edema and atelectasis. (AR 38.)

12     Then, the ALJ stated that an October 11, 2010 office visit noted that non-compliance was

13   still an issue, and that if it continued Plaintiff would have to follow up with another provider.

14   (AR 38.) At that time, Plaintiff reported blurred vision and shortness of breath, but denied

15   anxiety, chest pain, headaches, malaise/fatigue, neck pain, palpitations, peripheral edema, PND

16   and sweats. (AR 38.) The notes from his May 11, 2011 visit stated that Plaintiff's condition

17   waxes and wanes, and Plaintiff had no shortness of breath. (AR 38.) It was stated that

18   hypertensive end-organ damage included kidney disease and left ventricular hypertrophy with no

19   history of angina, coronary artery disease or myocardial infarction, heart failure, peripheral

20   vascular disease, or retinopathy. (AR 39.) The ALJ indicated that an April 28, 2011

21   electrocardiogram showed the abnormalities but with improvement from July 2009. (AR 39.)

22   Plaintiff was described as having a mildly dilated left ventricle, normal left ventricular systolic

23   function, moderate to marked concentric left ventricular hypertrophy, and left ventricular

24   ejection fraction of 60-65%, his mitral valve was normal, and aortic sclerosis without stenosis

25   with trace aortic insufficiency. (AR 39.)

26     The ALJ concluded that overall the medical record evidenced Plaintiff's severe

27   impairments and that they are managed with appropriate medical treatment and are improving.

28   (AR 39.) The ALJ then stated that throughout the record there is evidence of medical advice

given with regard to non-compliance, pointing to mention of this in connection with his lengthy hospital stay in October 2008 and Dr. Mito's statement in October 2010 that if Plaintiff continued to be non-compliant he would have to seek care with another provider. (AR 39.) The ALJ also discussed Plaintiff's treatment records from the Washoe County Detention Center from July 2010 through February 16, 2011, which showed numerous instances of refusals to take medication, do clinical services or failing to comply with daily medication recommendations. (AR 39.) These records included a note that Plaintiff tied to barter the provision of special meals or snacks for taking his medication, but such a proposal was denied and Plaintiff was told to take his medication for his own health benefits. (AR 39.)

Next, the ALJ stated it was reasonable to infer that Plaintiff's improvement is due in part to complying with the recommended treatment regimen for his chronic hypertension. (AR 39.)

The ALJ also noted that objective findings showed the Plaintiff denying many of the symptoms he was alleging in his application for benefits, including chest pain, shortness of breath, abdominal pain, nausea, vomiting, headaches, malaise/fatigue, neck pain, palpitations. (AR 39.)

Lastly, the ALJ concluded that while Plaintiff does have end-organ damage from his hypertension, renal insufficiency and left ventricular hypertrophy, diagnostic imaging and testing evidence did not present significant problems and were mild in nature. (AR 39.) As such, the ALJ determined that Plaintiff's allegations of severe, intense and significantly limiting symptoms from his impairments were unsupported by the medical record. (AR 39.) The ALJ indicated that this finding is consistent with that of the State agency non-examining physician, Dr. Henry. (AR 39.)

### 3. Plaintiff's Argument

First, Plaintiff argues that the fact that he performed work at one time which he can no longer perform is irrelevant because the ALJ determined Plaintiff could not perform his past relevant work. (Doc. # 16 at 14.) As such, this has no impact on how his hypertension impacts his ability to function during the disability period. (*Id.*)

Next, with respect to the ALJ's reliance on Plaintiff's non-compliance with prescribed

1    medication as a factor for discrediting Plaintiff, he first argues that the ALJ's reference to non-

2    compliance in October 2008 is irrelevant because Plaintiff's alleged onset date is November 17,

3    2008, and benefits are not retroactive. (*Id*.) Second, Plaintiff argues that his condition

4    deteriorated and he developed new hypertension related impairments and limitations despite his

5    compliance with prescribed treatment. (*Id*. at 15.) Third, with respect to the records from the

6    Washoe County Jail that evidence Plaintiff's non-compliance, Plaintiff asserts that he has had

7    hypertension his entire life and did not need to have his blood pressure or pulse checked every

8    few hours. (*Id*.) Plaintiff also claims that prior to this he did take his medication and even then

9    his hypertension was not controlled. (*Id*.) Plaintiff concedes there are statements attributed to

10   Plaintiff that he took his medication, but not all of the medication every day. (*Id*. at 16.) He

11   contends that on several occasions he gave reasons for refusing the medication, *i.e.*, because it

12   made him sick, caused numbness and tingling in his hands, he did not want to lose too much

13   weight. (*Id*.)

14        Finally, Plaintiff argues that the records from his time of incarceration does not show a

15   failure to treat or refusal to take medication which would ameliorate some or all of the symptoms

16   he experienced. (*Id*.; Doc. # 22 at 5.)

17        **4. Commissioner's Argument**

18        The Commissioner argues that the ALJ reasonably concluded that the record lacked

19   evidence to support the extent of Plaintiff's subjective complaints. (Doc. # 19 at 6.) First, the

20   Commissioner contends that the ALJ reasonably concluded Plaintiff's non-compliance with

21   treatment negatively impact his credibility. (*Id*. at 6-10.) Second, the Commissioner contends

22   that the ALJ reasonably considered Plaintiff's long history of hypertension. (*Id*. at 10.) Third, the

23   Commissioner points out that Plaintiff failed to challenge the ALJ's other reasons for finding

24   Plaintiff not fully credible, including his inconsistent statements, mild objective findings and

25   effectiveness of medication in treating his condition. (*Id*. at 10-12.)

26        **5. Analysis**

27        First, the ALJ's discussion of Plaintiff's chronic condition was proper. The ALJ does not

28   use this as a definitive basis for determining Plaintiff's RFC or ability to work; instead, the ALJ

1   cited the fact that Plaintiff had this condition his whole life and worked with it in the past as a

2   basis for finding Plaintiff's subjective complaints less than credible.

3          Second, the ALJ properly discussed various instances of Plaintiff's non-compliance with

4   recommended treatment as a basis for finding Plaintiff's subjective symptom complaints less

5   than credible. "An unexplained, or inadequately explained, failure to seek treatment or follow a

6   prescribed course of treatment" is a factor relevant to an ALJ's determination of a claimant's

7   credibility. *Bunnell v. Sullivan*, 947 F.2d 341, 246 (9th Cir. 1991). While the ALJ did point out a

8   reference to non-compliance in Plaintiff's October 2008 records which pre-dated the alleged

9   onset date, the ALJ went on to identify various other instances of documented non-compliance,

10  and considered this evidence in conjunction with the entire record. Plaintiff argues that the ALJ

11  did not demonstrate that compliance would have ameliorated some or all of the symptoms he

12  experienced. While it is true that the records evidence that Plaintiff suffered from hypertension

13  for most of his life, that the etiology was unknown and that some courses of treatment did not

14  appear to improve his condition, the ALJ cited to evidence in the record which demonstrated that

15  his condition was better managed and under better control when he did follow prescribed

16  treatment regimens.

17         As to the records from the Washoe County Jail, they are rife with references to Plaintiff's

18  refusal to take medication and have his blood pressure and pulse checked. Plaintiff claims that it

19  was his prerogative to reject "poking and prodding at every turn" and to take some medications

20  while not taking others. (Doc. # 16 at 17.) While he points out that on several occasions he did

21  give reasons for refusing medications, the majority of the refusals in the record give no reason

22  for the refusal. (AR 490 (refusing Tylenol and Norwasc because it makes him sick), 521 and 523

23  (refused medication because he did not want to lose too much weight); compared to AR 477

24  (Plaintiff said he does not take all medications every day, "just according to how he feels"), 480-

25  481, 483-484, 485 ("I don't want nobody checking my blood pressure today or any day", 488

26  ("Have current lab work at St. Mary's hospital"), 489, 491, 492 ("I wrote a grievance. I can't be

27  doing this every day", 493 ("I don't want to be bothered. I told the doctor that too!"), 494, 499,

28  500, 510, 513-515, 522 ("unneeded"), 524.)

The ALJ also pointed out various instances in the record where Plaintiff's condition improved when he was put on a medication regimen and followed doctor's orders. (*See e.g.*, AR 274, stating Plaintiff was admitted to the hospital with blood pressure of 230/120, was given treatment with various medications and blood pressure, while still high, was reduced to the 160s to 180s over 100 to 110 to 118.)

Therefore, the court finds that the ALJ's reference to Plaintiff's non-compliance is a specific, clear and convincing reason for finding his subjective complaints less than credible.

Third, while Plaintiff's motion focuses on the ALJ's reference to Plaintiff's non-compliance; however, the ALJ also pointed to the inconsistency between Plaintiff's subjective complaints and the objective medical evidence as an additional basis for finding Plaintiff's subjective complaints less than credible. The ALJ specifically pointed to evidence in the record where Plaintiff's health conditions, while chronic, were nevertheless deemed mild in nature. The ALJ noted that Plaintiff's rental ultrasounds in July and October 2008 revealed no significant abnormalities. (AR 38, 271, 274, 277-278.) His echocardiogram in October 2008 showed mild left ventricular hypertrophy, but was otherwise normal. (AR 38, AR 271, 273.) The records from St. Mary's on October 28, 2008 describe him as a "well developed, well-nourished male in no acute distress." (AR 275.) His physical examinations on October 23 and 28, 2008 were normal overall but noted Plaintiff's uncontrolled hypertension. (AR 275, 280.) His renal condition was to be monitored, but the doctor indicated that there should be improvement with better blood pressure control. (AR 275.) A July 2009 echocardiogram showed mildly reduced left ventricular systolic function with estimated ejection fraction of 30-35% globally. (AR 420.) A July 28, 2009, image of the lumbar spine showed the alignment was normal, narrowing disc space at L5-S1 and prominent surrounding spurs, but was otherwise normal. (AR 423.) A renal ultrasound around the same time showed the kidneys appeared normal. (AR 424.)

His treatment records from Dr. Mito show physical examinations that were generally normal other than his elevated blood pressure. (AR 38, 430-435.) A renal ultrasound showed normal kidneys and an electrocardiogram showed mild left ventricular hypertrophy and other findings consistent with mild pulmonary hypertension. (AR 38, 420, 424.) X-rays of the lumbar

spine did not show stenosis, cord compression or foraminal narrowing. (AR 38, 423.)  When he was seen on June 12, 2010 for shortness of breath, his physical examination was normal overall. (AR 38.) A chest x-ray performed the same day showed no evidence of pulmonary embolism, small right and tiny left pleural effusions, mild patchy pneumonitis in the right lower lobe and right upper lob, nonspecific soft tissue and mediastinal edema. (AR 461.) His lungs were clear and heart size was normal. (AR 462.) He was diagnosed with dyspnea and mild pleural effusion and discharged. (AR 38.) Washoe County Jail records from July 24, 2010, show that Plaintiff did not complain of headaches, shortness of breath, fatigue/malaise at that time. (AR 476, 478.) His subsequent physical examinations continued to be normal. (AR 38.) An April 28, 2011 EKG showed the same abnormalities but with improvement from July 2009. (AR 39.) An echocardiogram on April 28, 2011 showed the left ventricle mildly dilated with normal systolic function but moderate to marked concentric left ventricular hypertrophy. (AR 535.) The ALJ stated that Plaintiff's medical records from 2011 show Plaintiff appeared to be exhibiting more functional normalcy. (AR 39.) Other than uncontrolled blood pressure, his physical examination on October 11, 2010 was normal. (AR 563-564.) He had a normal physical examination on April 4, 2011, other than elevated blood pressure and possible referral for a sleep study. (AR 561.) At that time he denied chest pain, shortness of breath and headaches. (AR 561-562.) A follow-up note on May 9, 2011, stated Plaintiff's blood pressure was still very elevated but he had no new problems, denied shortness of breath and chest pain, anxiety, headaches, and sweats. (AR 560.) His physical examination was normal other than the elevated blood pressure. (AR 560-561.) On July 28, 2011, Dr. Mito stated that Plaintiff's blood pressure was still high, but Plaintiff was not reporting any new problems. (AR 694.) He did state that he would occasionally get a sharp pain his chest for a few seconds up to a couple of times a week. (AR 694.) On May 9, 2011, Plaintiff's blood pressure was still elevated, but again he reported no new problems. (AR 695, 700.) This physical examination was otherwise normal as well. (AR 700-701.)

Finally, the ALJ properly pointed out that the record contains many instances where Plaintiff previously denied experiencing many of the subjective complaints he complains of now. In October 2008, when Plaintiff was admitted for hypertension, he complained of blurry vision

and occasional headaches but denied chest pain, shortness of breath, abdominal pain, nausea, vomiting, dysuria and hematuria. (AR 38, 274.) Around the same time, he also denied blurry vision or headaches. (AR 287.) When he was seen on October 11, 2010 reporting shortness of breath he also denied anxiety, chest pain, headaches, malaise/fatigue, neck pain, palpitations, peripheral edema, PND and sweats. (AR 38.) On various visits with Dr. Mito, he denied the symptoms of which he now complains. (AR 430 (denied chest pain, abdominal pain, headaches and shortness of breath), AR 431-432 (complained of headaches but denied chest pain, abdominal pain and shortness of breath), AR 433 (complained of difficulty breathing at night, but no complaints of chest pain, abdominal pain of headaches), AR 435 (complained of headaches and denied chest pain, abdominal pain and shortness of breath).) On July 24, 2010, while at Washoe County Jail, it was indicated he did not suffer from headaches, chest pain or shortness of breath. (AR 476, 478.) Notes from 2011 indicate a similar listing of negative symptoms and included no shortness of breath. (AR 38, 560-563, 694-695.)

In sum, the court finds that the ALJ cited specific, clear and convincing reasons supported by the record for finding Plaintiff's subjective complaints less than credible.

## IV. CONCLUSION

After carefully reviewing the record as a whole, the district court should find there is substantial evidence to support the ALJ's determination and the ALJ's decision should be affirmed.

## V. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand and/or Reversal (Doc. # 16) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the Commissioner's Cross-Motion for Summary Judgment (Doc. # 20) be **GRANTED** and that the decision of the ALJ be **AFFIRMED**.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen

days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: July 29, 2014

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE